Michael J. Romano
ROMANO & ASSOCIATES
350 Old Country Road, Suite 205
Garden City, New York 11530
(516) 248-8880
*Attorneys for Plaintiffs*
*Dennis Michael Lynch and Project 1600 Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x
DENNIS MICHAEL LYNCH and PROJECT 1600 INC.,            VERIFIED COMPLAINT

              Plaintiff,                                   Docket No.

    -against-

MARINEMAX NORTHEAST LLC and
MARINEMAX INC.,

           Defendants.
------------------------------------------------------------------------------x
        Plaintiffs Dennis Michael Lynch ("Lynch") and Project 1600 Inc. ("Project 1600") (collectively, the "Plaintiffs"), complaining of defendants MarineMax Northeast LLC ("MarineMax Northeast") and MarineMax Inc. ("MarineMax") (collectively, the "Defendants"), by his attorneys, Romano & Associates, alleges upon information and belief as follows:

## **INTRODUCTION**

    1.    This action involves claims for fraud, unjust enrichment, negligent repair and maintenance, breach of contract, and breach of express and implied warranties, both under New York and federal maritime law.

    2.    In short, Defendants knowingly sold a defective watercraft to Lynch and, notwithstanding numerous promises to repair same, actually worsened the condition thereof, causing financial damages to Plaintiffs.

1

**PARTIES**

3.     Lynch is a domiciliary of the State of Florida, County of Indian River and during some of the time herein, was a domiciliary of New York State, County of Suffolk.

4.     Project 1600 is a corporation domiciled in the State of Florida, County of Martin and during some of the time herein, was a domiciliary of New York State, County of Suffolk.

5.     That at all times herein mentioned, MarineMax Northeast was and is a limited liability company domiciled in the State of New York, authorized to transact business in the State of New York, with an address in the State of New York, County of Suffolk.

6.     Each and every member of MarineMax Northeast is domiciled in the State of New York.

7.     That at all times herein mentioned, MarineMax was and is a corporation domiciled in the State of Delaware, authorized to transact business in the State of New York.

8.     MarineMax is the parent company of MarineMax Northeast.

**JURISDICTION AND VENUE**

9.     Pursuant to Article III of the United States Constitution, jurisdictional requirements are satisfied because multiple claims herein are based on federal maritime law and the Federal Boat Safety Act, 46 U.S.C. §4301, *et seq.*

10.     This action is also brought pursuant to the Full Faith and Credit Clause and this Court has original jurisdiction under 28 U.S.C. §1332 because it is a civil action wherein: (1) complete diversity of citizenship exists among the parties; and (2) the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

11.     The amount in controversy of this matter exceeds $75,000.00 exclusive of interest and costs because Plaintiffs seek damages for losses sustained as a result of Defendants' retaining of Plaintiff's monies paid for a defective watercraft.  Thus, the amount in controversy is satisfied for jurisdictional purposes.

12.     The complete diversity requirement is satisfied because Defendants are both domiciled in Delaware while Lynch was initially domiciled in New York but has since moved to Florida and Project 1600 is domiciled in Florida.  Thus, complete diversity exists amongst all of the parties.

13.     Venue is proper within this District under 28 U.S.C. §1391(b)(2) as a substantial part of the events or omissions forming the basis of the claims complained of occurred in this judicial district.

## FACTUAL ALLEGATIONS

### Defective Conditions of the Boat

14.     Pursuant to that certain Purchase and Sale Agreement dated May 19, 2020 (the "Agreement"), Lynch purchased from Defendants that certain 2019 Galeon 500FLY boat with HIN GLN50014G819 (the "Boat").

15.     The purpose for Lynch purchasing the Boat was to use it for selling CBD-inspired luxury charters to existing clients of Project 1600.

16.     To that end, Lynch (on behalf of Project 1600) made multiple social media posts, podcasts and videos advertising the Boat and rides thereon to prospective customers.

17.     Lynch (on behalf of Project 1600) also solicited information from an insurance broker regarding insurance coverage for use of the Boat as a charter.

18.     Lynch (on behalf of Project 1600) also joined two-full-service yacht clubs, one in New York and the other in Florida, to accommodate customers.

19.     Lynch (on behalf of Project 1600) also send numerous emails to Defendants informing them that he wished to use the Boat for such charters.

20.     For accounting purposes, the Boat is to be listed as a business expense, also evidencing the fact that the Boat was a business investment for Plaintiffs.

21.     Lynch named the Boat "DML CBD," as a means of advertisement of his commercial ventures, "DML" representing his name, Dennis Michael Lynch, and "CBD" for the products sold by Project 1600.

22.     In addition to the monies spent due to the acts and omissions of Defendants, Plaintiffs spent approximately $75,000.00 on products and services for the boat specifically for chartering.  By way of example, in addition to the yacht clubs, Plaintiffs paid approximately $15,000.00 for a marina in Stuart, Florida, simply because it was within 1/4 mile of the MarineMax location which would work on the Boat and keep it maintained for chartering purposes.

23.     Plaintiffs intended to offer charters on the Boat between mid-January and mid-May in the form of sunset cruises at a cost of $500.00 per customer, with full capacity being six (6) customers per cruise; and weekend cruises for $2,500 per customer, with full capacity being four (4) customers per cruise.  Thus, five (5) sunset cruises per week at full capacity for these sixteen (16) weeks would yield approximately $200,000.00 in revenues.  The weekend cruises for these 16 weeks at full capacity would yield approximately $160,000.00 in revenues.  These potential revenues, equaling $360,000.00, are all lost due to the acts and omissions of Defendants.

24.     For the sixteen (16) weeks between Memorial Day and Labor Day (summer months) in the Hamptons, in New York State, comparable sunset cruises cost $1,000.00 per customer.  Weekly sunset cruises for sixteen (16) weeks would yield $400,000.00.  Adding in weekend charters to Newport, Rhode Island; New York City and Block Island at a rate of $5,000.00 per customer, profits in excess of $320,000.00 would have been likely.  The total of potential revenues lost is $720,000.00.

25.     Of course, none of these numbers takes into account the lost business in CBD sales for Project 1600 which would have grown significantly due to planned offers of volume discounts for customers booking the Boat charters listed above.

26.     However, from delivery of the Boat to Plaintiffs in June 2020 to the present, myriad defects existed therein.

27.     Prior to purchase and delivery, Plaintiffs hired a surveyor to inspect the Boat.  A list of issues that existed then included:

- US Coast Guard safety items were not on board
- Exterior needed cleaning
- Glendening Cablemaster would not engage cord
- Pitting on cabin door
- Spider cracks sighted on superstructure forward by windshield and by snaps above windows
- Chipping paint in the anchor locker
- Water staining / corrosion on salon light switch panel
- Engine room needs light cleaning.
- Some small areas of staining in engine and bilge wells from small amounts of standing water
- Chipping pain sighted in bilge by the sea strainer
- The starboard power window is significantly slower than the port window
- Small stain was sighted on the galley floor
- The base panel of the Splendide washer / dryer was missing, some scratches in cabinet
- Lower right cabinet on starboard side of master stateroom would not shut/lock
- No cable signal on Master TV

- Neither of the heads in bathrooms will power up
- Electrical boards need replacement
- The upper bunk reading light did not work
- Chaffe mark by the fixed window of upper bunk from the mini blinds
- Scratches on Venturi windshield on flybridge
- Bridge cushions needs cleaning
- The forward side cushions on the bow are not onboard
- Cabin carpet needs cleaning
- No bimini top was onboard
- No chip in chart plotter units

27.     Defendants addressed several of these issues either before delivery or shortly thereafter but, specifically, failed to fix the following:

- **Pitting on the cabin door.**  Defendants claimed a cleaning would resolve the issue, at least in part.  No effort to fix this issue was ever put forward.  The pitting has now worsened and currently remains bad.

- **Spider cracks sighted on superstructure forward by windshield and by snaps above windows.**  Defendants claimed they would contact Galleon for warranty. No representative of Defendants or Galleon has made contact with Plaintiffs about this issue.

- **Chipping paint in the anchor locker.**  No representative of Defendants has ever addressed this issue.

- **Engine room needs light cleaning.  Some small areas of staining in engine and bilge wells from small amounts of standing water.**  No representative of Defendants has ever addressed this issue.

- **Chipping pain sighted in bilge by the sea strainer.**  No representative of Defendants has ever addressed this issue.

- **The starboard power window is significantly slower than the port window.** Joel, an independent contractor retained by Defendants, attempted to fix this issue. He reported that the window was sticking inside the panel.  He did not have the tools or know-how to repair.  Ultimately, he suggested Plaintiffs wait until the boat was in Florida for Plaintiffs to fix.  Months later when the boat was in Stuart, FL, Defendants told Lynch that the starboard window is designed to move slowly.  As this was never represented to Plaintiffs before purchase, this was a material misrepresentation of fact.

- **Small stain was sighted on the galley floor.**   Defendants said they would clean but not change the floor tile.  The stain currently remains in place.

- **The base panel of the Splendide washer/dryer was missing; some scratches in cabinet.**  The panel was replaced many months later by Joel.  However, the washer/dryer itself did not work.  It remained this way until Stuart, FL.  Defendants finally fixed the issue, but not until January 2021.  Thus, Plaintiffs went nearly ten months without the washer/dryer.

- **Lower right cabinet on starboard side of master stateroom would not shut/lock.**  This has not been remedied by Defendants.

- **No cable signal on Master TV.**   The problem was addressed multiple times by Defendants, but it remains a defect.

- **Chaffe mark by the fixed window of upper bunk from the mini blinds.** Defendants have not remedied.

- **Scratches on Venturi windshield on flybridge.**  Defendants have not remedied.

- **Bridge cushions needs cleaning.**  A cursory cleaning by Joel was conducted, but he said he could not get the cushions cleaned correctly because he did not have a cleaning crew due to COVID.

- **Cabin carpet needs cleaning.**  Was never done by Joel, with the excuse that no cleaning crew was available due to COVID.  While in Stuart, Florida, Defendants attempted to clean but, in the process, destroyed the rugs by using a cleaner that has permanently stained the rugs.

- **No Bimini top was onboard.**  Joel installed a top, but it appeared to be a used top which was ripped and the Velcro was old and worn.  The Bimini top was eventually replaced months later in Stuart, Florida, but the install was done incorrectly.  Defendants sent a repair crew, but to this day the top cannot be put up and down with ease, as the installation was faulty.

28.     In early June 2020, Lynch met Joel at Defendants' marina in Huntington, New York.  Joel was tasked with "delivery", which is a short way of saying he handed Lynch the keys to the Boat for the first time since his purchase was complete.  However, Joel had no experience with a Galleon yacht.  Nor was there any experienced employee of Defendants available to tour the Boat with Lynch.  No person from Defendants explained how the Galleon boat functioned.

Joel offered the barebones explanations of starting the boat, where fuel and water is filled, how to run the air conditioning, radio, and general basics of that kind, information useless to Lynch.  Upon Lynch's arrival, Joel apologized for the boat being dirty.  The cushions were soiled and the carpets filthy.  Joel explained that he did not have enough time to give the Boat a deep clean.   Joel and Lynch drove the boat from Huntington to Montauk, which is approximately a 3-hour ride.  Along that ride, new issues surfaced.  These issues and others would remain for most of the summer months in 2020.

29.   These issues included, but were not limited to:

- **Training & Waste Issue:**  In order to obtain insurance for the Boat, the insurance company required Lynch endure a 50-hour training regimen from certified captains. Two contractors of Defendants, Joel and Glen, provided Lynch with less than twenty (20) hours.  The remaining thirty (30) hours were paid for by Plaintiffs who hired a United States Coast Guard certified captain out of Florida named Sam Brennan ("Sam").  Plaintiffs flew Sam up to New York where he stayed on the Boat for a week.  Sam showed Lynch how to operate the Boat according to United States Coast Guard standards.  During these training sessions, Sam spotted an additional problem with the waste system.

- **Waste System Issue:**  To empty the waste (feces, urine, etc), the Boat provides two options.  The first is via pump out.  If a marina offers this service, the waste can be emptied via the port side.  If waste needs to be emptied while out at sea, there is a button on the starboard side of the boat that is pressed and held.  This process will empty the waste tank into the water.  Upon trying to conduct the empty process out at sea, Sam was incapable to get it to work.  He called Joel, which proved useless as Joel has no experience with Galleon boats.  To this day, the ability to empty the waste at sea is inoperable, making it so the bathroom waste backs up into the bilge. Lynch has had to manually clean the feces-filled bilge out on multiple occasions. Defendants failed to address this issue when first reported by Sam, and then again when Plaintiffs reported it to Defendants in Stuart, Florida.  Defendants falsely stated that nothing was wrong with the unit because they could not "replicate the problem."

- **Toilet Flushing Issue:**  In a separate issue, the toilet would not flush in the master bedroom.  Defendants sent a third-party mechanic to repair the problem.   Lynch was not there when the mechanic arrived.  He claimed the issue was a tampon flushed into the toilet, and he provided a photo.  Clearly this was false as nobody

on the Boat had ever used a tampon.  In addition to the repair, which Defendants stated was not under warranty, Defendants tried to bill Plaintiffs for hundreds of dollars in travel costs incurred by the mechanic, who stated the traffic caused him hours of car time.

30.     In addition to these issues, in the summer and fall of 2020, a list of problems surfaced, all of which Defendants were aware of and promised to remediate, through emails, text messages and other means.  Although some of the items were fixed during the summer months, many of them were not.  Joel suggested that Plaintiffs have Defendants' representatives in Stuart, Florida address the open issues in November 2020.

31.     In November of 2020, Lynch drove the boat from New York to Stuart, Florida, which is two-hours south of Vero Beach, Florida where he was renting a home for the winter months.  Although more expensive than other alternatives, Plaintiffs selected Sunset Marina in Stuart because it was close to Defendants' location where Joel indicated the Boat would be remedied.

32.     At that time, the following items remained defective:

- (A) Blinds in master bedroom were not working.  The line that secured them in place was broken.
- (B) Sounds like water dripping into the light fixture over the stove in kitchen.
- (C) The starboard engine had bad couplers, causing rubber shavings to spread all over the room.  A Volvo engineer indicated that a new boat should not have this issue.
- (D) Both engine mounts were not bolted down.  Volvo indicated that the alignment must be checked immediately.
- (E) The main exhaust hose on starboard side in engine room had a rip because it rubbed against the strainer casing.  Volvo engineers visited the Boat and replaced the hose but said this would only be a temporary fix because the entire exhaust housing needed to be revamped.  Furthermore, a faulty exhaust hose would cause sea water to fill the engine room and sink the boat.
- (F) The master state room door was not closing.
- (G) The starboard slide window toward the stern did not close.
- (H) The USB plug outlet on the fly bridge was not working.
- (I) The anchor was missing a security pin.

9

- (J) The light cover on the port side fly bridge fell off.
- (K) The salon door did not close or lock, causing the room to be infested with bugs.
- (L) The front spotlight did not work.
- (M) The washer and dryer did not work, causing water to leak under the bed.

33.    Defendants addressed and resolved A, B, C, D, I, J, L.  The other items and the

status of each remained as follows:

- **The main exhaust hose on the starboard side in the engine room has a rip because it rubs against the strainer casing.  Volvo engineers visited the Boat and replaced the hose but said this will only be a temporary fix because the entire exhaust housing needs to be revamped.**  Furthermore, a faulty exhaust hose would cause sea water to fill the engine room and sink the Boat. The exhaust issue is a huge ongoing problem.  It is important to note that a break or burst in the exhaust would likely cause the engine room to take on water.  This is a major issue, putting lives at risk.  Defendants claim they replaced the exhaust hose multiple times, but the problem still exists, with the starboard exhaust hose having a new rip.

- **The master state room door is not closing.**  Remains a problem today no matter how many times Defendants purportedly try to fix the issue.

- **The starboard slide window toward the stern does not close.**  This problem was originally reported by Plaintiffs while in New York.  After Joel was incapable of fixing the problem, Defendants sent in another technician who took the window apart; since then, the window will not lock at all.  He said he would be back in a week with a part to repair the window, but never showed up, nor did Defendants ever contact Plaintiffs regarding this.  Months later, Defendants in Stuart, Florida tried fixing the window by revamping the slide and locking mechanism.  They did this on both the starboard and port side windows.  The fix they put into place caused a set of new problems.  Although the windows will now close and lock, the parts used to fix the issue now cause the window's locking units to rub against whatever is near its path.  On the port side, the window now rubs against the kitchen counter, making divot marks on both the window and counter.  On the starboard side, the window now rubs against the bench seating area, and the chrome bar that keeps the bench seat in place.  This causes scratches on both the window and the seat/bar.  Operating the windows causes further damage to the Boat.

- **The USB plug outlet on the fly bridge is not working.**  Defendants reported this to Plaintiffs as being fixed, but it remains broken.  Thus, neither Plaintiffs nor anyone on the Boat can charge a phone from bridge.

- **The salon door does not close or lock, causing the inside of the boat to be infested with bugs.** Defendants have purportedly tried multiple times to fix this issue, but without success. Ultimately, the door shifts and the locking/closing mechanism does not work. This is a huge issue as the main door to the boat will not close or lock. When driving in the water, any rocking whatsoever will cause the door to fling open. If it is raining, rainwater comes inside. If it is buggy, bugs enter and create nests. If it is hot, the air conditioning is useless as the cold air rushes out the back door. And when at dock, the boat cannot be locked, so any person can enter the boat at will, a major security risk. A contractor of Defendants told Lynch that the door frame is faulty and shifts when in use, thus, making it so the door cannot close correctly.

- **The washer and dryer do not work, causing water to leak under the bed.** Although the washer/dryer issue is listed above as a problem repaired, the repair caused other issues. Indeed, the water from the washer/dryer unit ran onto both the rug and bed frame in the master bedroom, causing the bed frame to have a huge water stain. The rug is now destroyed and moldy. Defendants refused to replace the rug.

34.    In late November 2020, after Defendants in Stuart fixed certain items such as the coupler and exhaust, Lynch took the boat on a short trip to Fort Lauderdale to test the repairs. The waste issue continued, and feces and urine (black water) filled the bilge. The boat smelled like feces. Lynch had to go down into the engine room and physically remove the feces by means of using a bucket. Plaintiffs reported this issue to Defendants, but they only told Lynch via email that they "could not replicate the problem."

35.    With a list of issues still pending, Defendant's mechanic suggested Plaintiffs allow them to take the boat out of the water in order to repair all the punch list items at their marina in late November. Although Defendants promised to return the Boat by middle of December, Plaintiffs did not get it back until the end of January. Thus, the opportunity to charter the boat by mid-January was lost.

36.    In addition to the warranty work, Plaintiffs agreed to pay for additional services including, but not limited to, cleaning and painting the hull, costing Plaintiffs more than $8,000.

11

Part of the deal, which was confirmed in email from the manager at Defendant's facility, Rick Castellini, required Defendants to have a captain go over the Galleon with Lynch at pick up. Castellini wrote on Nov. 25, *"Barring any parts that we can not receive in time  the items will be corrected and we will provide you with an in water orientation when you return around the 18th of December."*  However, no such orientation was ever provided by Defendants to Plaintiffs.

37.    In late January, after two months of having the boat, Defendants finally claimed that all items had been repaired.  Again, when Lynch arrived at Defendants' facility, there was no captain or representative to go over the repairs, nor was there a captain to provide an orientation. Defendants simply handed over the keys again.

38.    The ride from Defendants' Stuart, Florida facility to Plaintiffs' was approximately 1/4 mile.  There is dangerously low water in the area, and so if a boat ventures out of the channel it is likely to hit bottom.  With this in mind, Lynch took the channel at no-wake speed, which is less than 5 knots.  The navigation tracker shows that Lynch's trip back to the marina was inside the channel and, as such, Lynch never hit bottom.  However, when checking the repairs on January 30, 2021, Lynch was forced to send the following email to Rick Castellini:

*Rick*

*When we spoke on the phone you told me you'd have Captain Larry go over the boat with me as if I was picking it up for the first time.  That didn't happen.  However that's the smaller issue.*

*For one, on Friday at pick up I get a water level alarm going off right out of the MM marina.  Scott sends over Dave Saturday morning to assess issue.  The pump section under master bed was filled with water.  I think it's coming from the washer machine you were supposed to repair. Dave seems to agree.  Leaves me to think the repair isn't done or your "fix" caused another problem.*

*In addition to dealing with the above, the bimini top is new — great. But the polls that are supposed to sit in the circle slots are not.  Instead they're positioned on the*

12

*floor. The scuffs are intense, and nobody cared to clean. Thus, installation of the poll on each side is rigged. It's set for collapse once I take this boat out in the ocean.*

*Next, and totally infuriating, is Dave must have left the back door open when draining the bilge water. I've got bugs everywhere. When I go to shoo away the bugs I see that whoever was working on this boat put their dirty hands all over the white ceiling. I've got dirty finger marks all over from front to back. Instead of going out on the boat Saturday I'm stuck inside trying to methodically cleaning away some of dirty prints but my efforts fall short; there's some prints I can't get out. And I'm not about to run a rag hard into the soft material and ruin the plush look or wear the finish down.*

*I didn't have to give you all the extra work at $8k, but I did out of good faith. Mistake on my end.*

*What in heavens name are you folks doing over there? Does anyone check this stuff?*

*When Scot gave me the boat Friday, the back locker door was wide open with rags and items falling it. The back locker door won't close shut. Scot blew it off and at the time so did for the sake of getting to boat back to my marina before the dock master left for the day. Having waited on this boat for nearly two months I had to ensure my slip was still there.*

*Getting back to the boat: Dave says engine area bilge was left dirty.*

*At this point you're either a man of your word or not. Either show me the respect I deserve and get someone here Monday who gives a damn about getting this boat right, or just tell me to go fly a kite and I'll let my lawyer deal with MM and I'll call Amex. My patience are shot and the nice guy routine is over. I want the issue with the bilge pump fixed. I want the bimini on correctly and the area cleaned and scuff free, and I expect the ceiling to look like it did when I turned it over. Photos are attached. Not sure how clear they look but it serves as reference.*

39.     Defendants sent a mechanic the next day, who fixed the Bimini, at least in part —

the Bimini continues to be a problem when opening and closing. The washer/dryer unit and the

water issues were represented as being resolved. The ceiling was cleaned but the bugs remained

for weeks.

40.     On February 10, 2021, Plaintiffs tried using the boat for the first time since getting it back from Defendants.  Less than five minutes of being on the Boat the engine alarms went off.  Lynch shut both engines down as smoke billowed from the back of the Boat.  Lynch immediately anchored the Boat inside the channel where it had stalled and contacted Defendants, who sent over a service boat.  Jay, a contractor of Defendants who services Volvo engines, asked if Plaintiffs had hit bottom.  The engine strainers were filled with sand which, according to Jay, **"only happens when the boat is operating in extremely low water or when hitting ground."**

41.     After reviewing the navigation chart, Lynch and Jay noticed zig-zag-like lines indicating that during the time Defendants had the Boat at their Stuart facility, the boat had been driven in the dangerously low waters.  Although Defendants admitted they took the boat for test rides, and admitted they took the boat in the shallow areas where boats of this size should not go, they denied hitting bottom, something clearly false.

42.     Within a day of this incident, Lynch took the Boat for a test drive and noticed the following new problems:

- The water alarm in the bedroom bilge was blaring,
- The steering wheel was shaking when getting to speeds above ten knots and
- The bathroom water was not running properly.

43.     At the end of February 2021, Rick and Defendants' Director of Fixed Operations, Dan Pride, came to test drive the Boat.  The blaring alarm was turned off and water bailed.  The bathroom water was now running, and they claimed that Lynch may have experienced the issue out of his failure to turn the water pump on.  However, for the first twenty minutes of the ride, the Boat would not go above ten knots.  Dan thought it was the exhaust hose they had replaced and, in an email dated February 25, he wrote:

14

*Dennis, just wanted to follow up- we are finding the metric exhaust hose is out of stock- at all our suppliers- I have some calls into a couple places waiting to hear back. We are going to try and have Jeff come by tomorrow and see if we can knock off a couple of the small items. I was also talking with Volvo about the turbo lag when we first went out- he mentioned that if the engine was not up to temp that that can occur.*

44.     A few days later, more problems arose including, but not limited to, the following:

- The televisions in the bedrooms and the main cabin were not working.  The three units were not powering on, nor was the main television in the galley lifting up from its enclosed position located behind a wall.  "Jeff", a representative of Defendants, reported a bad breaker.  Rick Castellini promised to order a replacement breaker within the week.  A few days later, Rick indicated that the television issues were due to a different issue and not the breaker.  Whatever the problem was, the problem was resolved.

- Down in the main bedroom the bottom panel of the bed had a large water stain.  Although Rick Castellini asked Scott, another representative of Defendants, to look into it, this never happened.  The water stain remains there today.

45.     Not seeing the value of keeping the Boat in Stuart, Florida, Plaintiffs relocated it to Lynch's home in Vero Beach.  During the trip from Stuart to Vero, the engine warning light blared a few times.  In addition, the Boat was now veering to the left and performance was sluggish.

46.     Defendants sent a technician to Lynch's house where the Boat was now located. The engine alarm read "*inlet temp too high*".  The technician looked into the engines and saw bad inverters.  The inverters were repaired but the problem did not go away.  The alarm continued and the Boat would not perform.  After a test drive, the technician concluded the issue was too big for him to solve.  Defendants sent Jay, again, who ultimately repaired the inlet sensor.

47.     In an attempt to eliminate the possible errors causing the Boat to not perform, Plaintiffs called in a diver to clean the bottom of the Boat from barnacles and ocean growth that arose because Plaintiffs were unable to use it due to Defendant's in ability to provide a working Boat.  While the diver was cleaning the bottom of the Boat, a part used to determine the Boat's

speed came loose and shot up into the bilge.  This caused water to flow into the boat.  Scared the boat would sink, the diver asked Lynch for help.  Lynch called Jay, who told Lynch to go into the bilge and look for the transducer collar.  But there was none to be found.  According to Jay, the unit was sucked up into the bilge because the transducer collar was never installed.  The diver had to fill the hole from below with a rag, and lynch rigged a temporary fix inside the bilge to prevent more water from flowing in past the rag.  Jay ordered a transducer collar and fixed the problem weeks later.  Had this issue arisen on the open waters, the Boat would have sunk and human lives potentially lost.

48.     As detailed above, the carpets cleaned by Defendants in the bedroom and on the stairs were cleaned incorrectly in January 2021. Likely due to the fact that Defendants used a cleaner with bleach.  By March 2021, the areas of carpet that are subject to sunlight began to turn black.  The carpets in the bedroom began to change color and smell.  Despite Rick stating Defendants would look into the stain on the bed frame, they never addressed the issue.  When Plaintiffs contacted Defendants in March, they said they would not fix the carpets nor did they address the bed frame.

49.     In May 2020, Plaintiff was forced to hire Jay, paying him out of pocket to repair issues that would otherwise be under warranty, and to double check the hose repairs made by Defendants.  Reason being, Plaintiff's insurance policy required the Boat to be north of the Florida state line before June 1, 2020 (hurricane season).  The out-of-pocket expenses were more than $5,000.00.

50.     In addition to the list of punch list items that remain open, for the first time since receiving the boat back from Defendants in January, Lynch tried to use the showers on June 1

16

while traveling from Vero, Florida to New York. The water in the shower basin would not go down the drain, as if there was a clog. At the same time, the bilge alarms went off. Lynch called Jay, who suspected the pumps were not working. It turns out that the pumps, which are located in the same area as the pump for the washer/dryer, were not pumping the water out from the boat, thus, causing water to fill up in the bilge and pour out onto the carpets. Either the repairs made to the washer/dryer caused the issue, or it is another defect. Plaintiffs stopped the Boat at a facility of Defendants in Wrightsville Beach, North Carolina where a technician of Defendants who has worked on boats for 30 years said he could not fix the problem because he is unfamiliar with Galeon boats. He went on to say that none of the mechanics working for defendants understand the nuances of Galeon boats, which are manufactured in Poland but sold in the United States exclusively by Defendants. When Plaintiffs arrived in New York, Lynch contacted Defendants at the Huntington location where he had purchased the Boat to get the pumps repaired, but he was told by Defendants that in order to be placed on the schedule he had to provide his credit card number because the 85-mile car ride to his location was not covered under the warranty. Lynch refused to give Defendants more money. Thus, even though solely due to the acts and omissions of Defendants, Plaintiffs continue to suffer this problem today.

51. The waste issue has never been solved. While on the way to New York, Lynch had to make a stop at Atlantic City, New Jersey because the boat began to smell like human feces, causing Lynch to manually dump the feces by use of a spaghetti pot because the discharge button remains broken. Again, rather than repairing this problem, the shower pumps, and the ongoing door closing and locking issue, Defendants required Plaintiffs to provide a credit card to get on the schedule.

17

52.     In sum, following minimal efforts by Defendants and certain contractors retained by them, the Boat remains in a substandard condition, rendering it unsuitable for operation, with Defendants' attempts at repairs often causing greater problems with the Boat.  Since arriving to New York on June 8, as of July 10, Plaintiff was not able to use the Boat even one time due to the ongoing issues, nor has he been able to launch his charter service, causing greater financial losses.

53.     The above are merely lists of examples of problems with the Boat and Defendants' substandard service—it is nowhere near exhaustive.

54.     In addition to communications between Plaintiffs and Defendants, counsel for Plaintiffs has also transmitted multiple correspondence to Defendants who, after receipt of same, promised to remediate the defects.

55.     Notwithstanding these promises, Defendants have failed to repair the Boat, rendering it nearly unnavigable at this juncture, with the following problems existing:

- For months, the Boat has only reached a maximum of ten (10) knots (with an extremely strain on the engine) before the Boat begins to shake.  It cannot maintain a safe cruising speed and the turbo has functioned infrequently.  Although it worked somewhat better during Plaintiffs' recent trip to New York from Florida, it is likely to malfunction again;

- There is no internet or Bluetooth which, among other things, renders it nearly impossible to navigate correctly and use the mapping system on the Boat;

- The exhaust hose, although replaced several times, is once again showing signs of ripping.  This could result in a greater issue causing the Boat to fill with water, causing it to capsize;

- The carpets are stained to a decrepit condition and continue to deteriorate;

- There is a flooding problem in the master bedroom, leaking up the rugs and the side of the bed, causing a bleach-like condition.  This is likely to cause rotting, mold and other water-related maladies;

- The back door still does not close or lock correctly, a major security issue and, if in a storm the ocean, is likely to cause water to flood the Boat.  To keep it closed,

someone must stand and hold it, something extremely dangerous if in oceanic swells.  Currently, while idle, a rope is required to keep it closed as the door frame has never been repaired by Defendants. A rope keeping the door shut is visible to all who pass by, thus, indicating the lock is defective.  There is no way to keep the boat safe when Lynch is not near the boat.  When he is inside, his only means of "security" is placing an extendable metal bar in front of various ingress areas;

- Both side windows rub on the seats and kitchen counter, causing consistent damage thereto;

- The radio does not work in all areas of the Boat;

- The waste release valve is defective so that when waste is deposited in the toilet it does not properly exit the Boat, resulting in awful odors, unhygienic conditions and an overall health hazard.

55.    Clearly, the Boat is unsafe to operate.

56.    In addition, many of the technicians sent by Defendants to perform repairs were unqualified to do so, nearly all having had no prior experience with Galeon boats.

57.    During one week, three (3) difference contractors were sent by Defendants to remediate the water tank issue and none of which were able to do so.

58.    As a result of the foregoing acts of Defendants, Plaintiffs have been—and continues to be—significantly damaged.

59.    In order to use the Boat at all, Plaintiffs have spent at least $75,000.00 of their own money.

**Communications with Defendants**

60.    By email dated May 19, 2020, Justine Stellin of Defendants promised to make many repairs and remediate other defects.

61.    On November 12, 2020, Lynch informed Tammy Galati of Defendants of thirteen (13) defects on the Boat.

62.     On November 16, 2020, through email correspondence with Tammy Galati, Justine Stellin, Brian Duncan, and Darrin Scali of Defendants, Defendants promised that James Turowsky would reach out to Lynch to schedule a time for repairs.  He did not initially do so.

63.     On November 16, 2020, notwithstanding the many defects with the Boat, Tammy Galati of Defendants indicated that no repairs would be performed unless Plaintiffs paid an outstanding invoice.

64.     On November 18, 2020, counsel to Plaintiffs transmitted correspondence to Defendants listing nineteen (19) defects and threatening litigation if they were not resolved.

65.     On November 20, 2020, counsel to Plaintiffs transmitted correspondence to Manny A. Alvare, III, general counsel to Defendants, also demanding a proper resolution to this matter and threatening litigation should no resolution be reached.

66.     In response to said correspondence, Defendants promised to repair the Boat.  They failed to do so.

67.     On November 23, 2020, Plaintiffs informed Defendants of the following defects:

- washer dryer not working
- starboard window doesn't slide open and lock in
- starboard captain window drags when opening
- back door is out of line; even after attempting to fix it, there are still terrible noises and marking up the glass
- spotlight doesn't work
- Bimini top and pole system is a total nightmare with rips and missing screws
- freezer intermittent

68.     On November 25, 2020, Rick Castellini of Defendants promised Plaintiff as follows:

> Thanks Dennis. We will address all the items on your list below. Barring any parts that we can not receive in time  the items will be corrected and we

will provide you with an in water orientation when you return around the 18th of December.

69.     The items were not corrected.

70.     On November 28, 2020, Lynch informed Defendants that the "fixes" by Defendants caused more problems in the engine room, the bilge pump and others.

71.     On January 30, 2021, Lynch informed Rick Castellini of Defendants of the defects listed in paragraph 26 above.

72.     Through email correspondence with Scott Seip of Defendants on April 15, 2021, Defendants listed a disingenuous timeline of events in an apparent attempt to excuse Defendants' willful and contumacious behavior yet failed to take steps required to repair the Boat.

73.     As evidenced by emails dated April 17, 2021, even when a contractor retained by Defendants was scheduled to perform remedial work on the Boat, Defendants delayed in scheduling same so that it became a last-minute inconvenience for Plaintiffs.

74.     Notwithstanding the fact that contractors of Defendants visited the Boat, between May 7 and May 10, 2021, Lynch communicated with Scott Seip, Dan Pride and Rick Castellini of Defendants regarding the air conditioning and other items still not functioning.

75.     On May 8, 2021, Lynch informed Scott Seip, Dan Pride and Rick Castellini of Defendants that the slider on the port side of the Boat would not open.

76.     Also on May 8, 2021, Lynch informed Scott Seip, Dan Pride and Rick Castellini of Defendants that the air conditioning on the Boat was not functioning.

77.     On May 9, 2021, Lynch informed Scott Seip, Dan Pride and Rick Castellini of Defendants that the engine was still not functioning properly.

78.     On June 7, 2021, Defendants refused to perform repairs covered by the relevant warrant(ies) because Plaintiffs failed to complete a particular form notwithstanding the fact that Defendants had all of the above information for many months.

79.     To reiterate, notwithstanding all of these communications, the Boat remains rife with problems.

**AS AND FOR A FIRST CLAIM**
**(Violation of the Federal Boat Safety Act)**

80.     Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained above and incorporates the same herein by this reference as though set forth in full.

81.     The Federal Boat Safety Act, 46 U.S.C. §4301, *et seq.*, requires, among other things, that the sellers and/or manufacturers of a recreational vessel repair and/or replace all unsafe defects in a vessel such as the Boat.

82.     The Boat is a "recreational vessel" as contemplated by this statute.

83.     As detailed above, Plaintiffs properly notified Defendants of the defects on multiple occasions.

84.     By failing to remediate the defects described herein, Defendants violated this statute.

85.     As a result of Defendants' violation of this statute, Plaintiffs have been financially damaged.

86.     Accordingly, Plaintiffs are entitled to an award of damages to be determined at trial, but not less than Ten Million ($10,000,000.00) Dollars, plus interest, costs, expenses and attorney's fees.

## AS AND FOR A SECOND CLAIM
### (Fraud)

87.     Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained above and incorporates the same herein by this reference as though set forth in full.

88.     As detailed above, following execution of the Agreement, on multiple occasions, Defendants represented that they would remediate the defects listed above.

89.     These were material misrepresentations of fact by Defendants.

90.     Defendants never intended to remediate the defects listed above.

91.     Plaintiffs relied on these representations by not attempting to return the Boat.

92.     Plaintiffs relied on these representations in making promises to potential clients to transact business on the Boat.

93.     As MarineMax is a national brand, Plaintiffs' reliance on these misrepresentations was reasonable.

94.     As a result of Defendants' misrepresentations, Plaintiffs were financially damaged.

95.     Accordingly, Plaintiffs are entitled to an award of damages to be determined at trial, but not less than Ten Million ($10,000,000.00) Dollars, plus interest, costs, expenses and attorney's fees.

## AS AND FOR A THIRD CLAIM
### (Unjust Enrichment)

96.     Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained above and incorporates the same herein by reference as though set forth in full.

97.     By accepting the purchase price of $945,117.50 from Plaintiffs and not providing an operable Boat, Defendants were unjustly enriched.

98.   Defendants' enrichment was at the expense of Plaintiffs, who has been denied use of the Boat.

99.   It is against equity and good conscience to permit Defendants to retain the purchase price of $945,117.50.

100.   Accordingly, Plaintiffs are entitled to an award of damages to be determined at trial, but not less than Nine Hundred Forty-Five Thousand One Hundred Seventeen Dollars and Fifty Cents ($945,117.50), plus interest, costs, expenses and attorney's fees.

**AS AND FOR A FOURTH CLAIM**
**(Negligent Repair and Maintenance)**

101.   Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained above and incorporates the same herein by this reference as though set forth in full.

102.   Defendants were in the business of regularly selling boats.

103.   By selling the Boat to Plaintiffs, Defendants owed a duty to properly maintain and repair the Boat.

104.   By failing to properly maintain the Boat, Defendants breached that duty.

105.   By failing to properly remediate the defects listed above, Defendants breached that duty.

106.   As a result of Defendants' failures, Plaintiffs were damaged.

107.   Accordingly, Plaintiffs are entitled to an award of damages to be determined at trial, but not less than Ten Million ($10,000,000.00) Dollars, plus interest, costs, expenses and attorney's fees.

## AS AND FOR A FIFTH CLAIM
### (Breach of Contract)

108.    Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained above and incorporates the same herein by this reference as though set forth in full.

109.    The Agreement was a binding contract between Lynch and Defendants.

110.    The Agreement was supported by consideration.

111.    By paying the purchase price of $945,117.50, Lynch complied with his obligations pursuant to the Agreement.

112.    By failing to deliver the Boat in a usable condition, Defendants have breached their obligations pursuant to the Agreement.

113.    By failing to perform remedial work sufficient to remediate the defects detailed above, Defendants have breached their obligations pursuant to the Agreement.

114.    Project 1600 is a third-party beneficiary of the Agreement.

115.    As a result of Defendants' breaches, Plaintiffs have been damaged.

116.    As a result of Defendants' breaches, Plaintiffs lost the purchase price of $945,117.50.

117.    As a result of Defendants' breaches, Plaintiffs lost the use and enjoyment of the Boat from June 2020 to date.

118.    As a result of Defendants' breaches, Plaintiffs lost hundreds of thousands of dollars in business opportunities, as detailed above.

119.    Accordingly, Plaintiffs are entitled to an award of damages to be determined at trial, but not less than Ten Million ($10,000,000.00) Dollars, plus interest, costs, expenses and attorney's fees.

## AS AND FOR A SIXTH CLAIM
### (Breach of Express and Implied Warranties)

120.    Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained above and incorporates the same herein by this reference as though set forth in full.

121.    Plaintiffs purchased the Boat from Defendants who are merchants with respect to goods of that kind.

122.    The Boat was defectively designed or manufactured, and, as such, was not reasonably fit for its ordinary purpose.

123.    The defect existed when Defendants delivered the Boat to Plaintiffs.

124.    As a result of the defects, Plaintiffs have been financially injured.

125.    Defendants, at the time of contracting, knew the particular purposes for which Plaintiffs required the Boat.

126.    Defendants knew that Plaintiffs were relying on Defendants' skill or judgment to select the Boat for Plaintiffs' purposes.

127.    Plaintiffs in fact relied on Defendants' skill or judgment in selecting the Boat.

128.    Defendants made a material statements amounting to a warranty to Plaintiffs.

129.    Plaintiffs relied on this warranty as a basis for entering into the Agreement.

130.    By failing to provide an operable Boat and failing to repair and remediate same, Defendants breached this warranty.

131.    As a result of these breaches, Plaintiffs have been financially damaged.

132. Accordingly, Plaintiffs are entitled to an award of damages to be determined at trial, but not less than Ten Million ($10,000,000.00) Dollars, plus interest, costs, expenses and attorney's fees.

### AS AND FOR A SEVENTH CLAIM
#### (Punitive Damages)

133. Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained above and incorporates the same herein by this reference as though set forth in full.

134. Defendants' actions were solely designed to afford Defendants personal gain to the detriment of Plaintiffs.

135. Defendants' actions constitute a conscious and deliberate disregard of the interests of others.

136. Defendants' actions were willful and wanton.

137. Defendants' actions were close to criminality, in violating the Federal Boat Safety Act.

138. Defendants' actions were reckless and of a criminal nature, in violating the Federal Boat Safety Act.

139. Defendants' actions were malicious.

140. Defendants' actions were gross and outrageous.

141. As a result of the foregoing, Plaintiffs should be awarded punitive damages in excess of Ten Million ($10,000,000.00) Dollars

### DEMAND FOR JURY TRIAL

142. Plaintiffs hereby demand a jury trial on all claims with respect to which they have a right to jury trial.

WHEREFORE, Plaintiffs demands judgment against Defendants as follows:

(1)    On the First Claim, in an amount not yet determined, but believed to be in excess of Ten Million ($10,000,000.00) Dollars.

(2)    On the Second Claim, in an amount not yet determined, but believed to be in excess of Ten Million ($10,000,000.00) Dollars.

(3)    On the Third Claim, in an amount not yet determined, but believed to be in excess of Ten Million ($10,000,000.00) Dollars.

(4)    On the Fourth Claim, in an amount not yet determined, but believed to be in excess of Nine Hundred Forty-Five Thousand One Hundred Seventeen Dollars and Fifty Cents ($945,117.50).

(5)    On the Fifth Claim, in an amount not yet determined, but believed to be in excess of Ten Million ($10,000,000.00) Dollars.

(6)    On the Sixth Claim, in an amount not yet determined, but believed to be in excess of Ten Million ($10,000,000.00) Dollars.

(7)    On the Seventh Claim, punitive damages in excess of Ten Million ($10,000,000.00) Dollars.

TOGETHER with such other or further relief, including an award of costs, disbursements

and reasonable attorney's fees, and such other and further relief as this court deems just and proper.

Dated: Garden City, New York
       July 13, 2021

_____
Michael J. Romano, Esq.
ROMANO & ASSOCIATES
*Attorneys for Plaintiff*
400 Garden City Plaza, Suite 432
Garden City, New York 11530
(516) 248-8880

28

DEFENDANT'S ADDRESSES:

MarineMax Northeast, LLC          MarineMax Inc.
c/o Corporate Creations Network Inc.    c/o Corporate Creations Network Inc.
3411 Silverside Road              3411 Silverside Road
Tatnall Building, Suite 104       Tatnall Building, Suite 104
Wilmington, DE  19810          Wilmington, DE  19810